HENRIETTA SCHRIMPF V. JOSEPH AND JULIA SETTEGAST.

1.  When a citizen or subject of a foreign government emigrates to this State, and, after residing here long enough, makes the usual declaration before the clerk of a court of record, of his *bona fide* intention to become a citizen of the United States, but dies before he has remained long enough to receive his certificate of citizenship, his children, born abroad, who came to Texas with the father before attaining the age of seventeen years, take the estate of inheritance in the lands owned by the father, and, on attaining the age of twenty-one years, become citizens of the United States and of the State of Texas.

2.  Possession and improvements by the vendee under a parol contract for the sale of land entitles the vendee to a specific performance on payment of the purchase money.

APPEAL from Harris.   Tried below before the Hon. James Masterson.

This case was before this court at a former term, and will be found reported in 35 Texas, 323.   It was then remanded for trial, reversing the decision of the court below, which sustained appellant's special demurrer to appellees' petition on the ground that no title to the land could vest in the plaintiffs by the death of their ancestor in 1853, under the laws then in force, because of the alienage of their ancestor and themselves.

The petition, among other allegations of equitable right by parol contract of purchase, averred that a deed for the land had been executed by Schrimpf, and that title had vested in Settegast before his death.  This material fact was, therefore, admitted by the demurrer.  The decision of this court, as understood and enforced on the trial below, was, in effect, that a resident alien, who had made declaration of intention to become a citizen, but who died before being naturalized, was yet competent and capable, as a citizen, both to take and to hold land by title ; and, also, that upon the death of such resident ancestor, the title to lands was transmitted from him to his minor children, and that they also were capable of taking, and did take, title by descent from the ancestor, and that upon coming of age they could maintain an action for possession of the land.

This decision and the construction of the opinion of this court was carried out in its full extent by the court below, on the trial had there.

The pleadings are the same as on the former appeal, except that the demurrer was overruled and a trial had on the answer denying the merits alleged.  The petition, as amended, alleged that Settegast and appellees were natives of Prussia ; that he emigrated in the year 1851 with his family, including his infant children, the appellees ; that soon after he made a parol contract for purchase of the land with Schrimpf, accompanied with possession under it, and made valuable improvements, then worth $1000, and resided and died on the land in 1853 ; that he paid the purchase money and received a deed from Schrimpf, which had been lost or destroyed by Schrimpf after their ancestor's death in 1853 ; that if in fact the money had not been paid and no deed made, appellees were now ready and willing to pay the money and interest ; that their ancestor had made a declaration of inten-

tion to become a citizen before the clerk of the District Court of Harris county, in the year 1853, and had died in the fall of that year without having been naturalized; but that the appellees had recently, since they came of age and since Schrimpf's death, been admitted as citizens under the naturalization laws; and they prayed for absolute judgment for the land, or for a decree for specific performance of the parol contract by execution of title and possession to them, as the facts might turn out on trial.

To this petition the defendant (appellant) demurred, which demurrer was overruled, and also answered under oath to the merits. She did not controvert the allegations about the foreign nativity of the appellees and their ancestor; nor of his declaration of intention to become a citizen and having died before being made a citizen; nor of appellees having recently been naturalized; but she did deny all knowledge of the sale of the land, denied that purchase money had ever been paid, denied that any deed had been executed, or any written contract, but said that the possession of the land had been allowed during Settegast's life, and that the improvements, which had been destroyed by fire, had been made by Schrimpf as a means of assisting his destitute countryman and family, and not as a matter of bargain and sale.

The verdict of the jury found against the alleged payment of the purchase money, and against the existence of any deed from Schrimpf, but that there was a parol contract for sale, and possession and improvements, the whole purchase money remaining unpaid.

Appellant's motion for a new trial, on the ground of errors in the charges of the court and rulings on the evidence, was overruled, and also appellant's motion in arrest of judgment upon the verdict.

The charges were in accordance with the decision of the

case on the former appeal.   We find no statement of facts in the transcript.

*Grey & Botts*, for appellant.—That William M. Settegast was an alien at the time of his decease is too manifest to require argument.   The intention to become a citizen at the time of his decease is an admission that he was not a citizen, unless indeed the intention is in fact the act itself.   Intentions do qualify acts, but are not the very deeds.

Appellees admit that they were not then citizens, for they allege that they became naturalized as citizens more than twenty years after the death of their father.   From this it is clear that they were aliens at that time, as it is that their father was an alien.   They were all resident aliens.

The next point, which arises also on the charge of the court, and on the motion in arrest of judgment upon the verdict, is, whether it be true that an alien who had made a parol contract for land and was in possession, before making a declaration of intention to become a citizen, but afterwards made such declaration before a clerk, did thereby acquire such equitable title as he could enforce by law against a citizen, before being admitted to citizenship; and further, whether upon the death of such alien in 1853, before admission to citizenship, the law would transmit such title from him by inheritance to his alien children as would entitle them, fifteen years afterwards, upon becoming citizens, to enforce such a contract by law, the purchase money having never been paid before suit.

We must briefly as possible premise certain propositions argued formerly, and not decided by the opinion of this court on the former appeal.   These are embraced in the general statement that the history of legislation from

the earliest period in Mexico, the Republic of Texas, and State of Texas, down to February, 1854, shows hostility to aliens holding land; and that trammels were thrown around its transmission by inheritance or devise by those who were allowed to hold title while residents.

Your former opinion cites a statement from Escriche, in the decision made by that chief justice, in Yates v. Iams, 10 Texas, 168; and you approve that statement as being his observations on the laws of Spain, relating to aliens; and you say that they were more liberal to them than the common law. We now respectfully call your attention to the fact that the chief justice did not concur in that statement as being correct; and, also, to the parts of that opinion which related to the case decided, under the laws of the Indies and of Mexico, in 1823.

In the case of Holliman v. Peebles (6 Texas, 673), abandonment of the country was, without office found, held *ipso facto* the vacation of the grant to Holliman; and that an alien could not sue for land. In Yates v. Iams, it was held that an alien heir did not inherit from a citizen holding title to land. These cases are followed by numerous others, all showing the stringent rules of Mexican policy, even as against foreigners, who had been invited and settled in Texas as colonists.

"An alien could not take or hold under the Mexican law; and it was error to strike out a plea that the plaintiffs were aliens when they purchased." (Clay v. Clay, 26 Texas, 30; and Lacoste v. Odum, Id. 459.)

"Aliens could not inherit, under the Mexican law, prior to the Constitution of the Republic." (Hornsby v. Bacon, 20 Texas, 559.)

"It is too well settled, by repeated decisions of this court, to be longer regarded as an open question, that, at the period of the death of Charles Baird (1833), his heirs,

being aliens, could not inherit his estate." (Blythe v. Esterling, 20 Texas, 568.)

"The right of the alien heir to claim land must be tested by the laws anterior to the Constitution of the Republic of Texas ; and by them such right cannot be sustained." (Middleton v. McGrew, 23 Howard, 48, 49, citing Mexican Ordenos y Decretos, Vol. IV., 155, and various Texas decisions.)

The laws of the Republic and State, and the former decisions of this court under them, show some changes of policy from the Mexican laws in regard to the rights of aliens to real estate. They indicate an enlargement of view and more liberality, yet subject to several serious restrictions. The disabilities were not entirely removed.

They allowed aliens to take and hold by titles emanating directly from the government, and with that right, of course, were recognized all rights and powers to enforce them by suit, pertaining to a citizen as incidents of that right. In this was included the powers to sell, devise or transmit to heirs, and of their heirs taking title by descent. The fact that the titles emanated from the government was the controlling element in many of the decisions favorable to aliens and contrary to the common law. Such decisions may mislead as the law of cases where titles did not so emanate, unless the distinction be carefully observed.

Other cases, controlled by the fact that the title emanated to aliens from government, are Norvell v. Finch, 15 Texas, 165 ; Kilpatrick v. Sisneros, 23 Texas, 113 ; Hays v. Barrera, 26 Texas, 78.

Again, these laws allowed an alien to take title by purchase from a citizen, and also to hold against all except the government, although the Constitution of 1836 and the common law forbid an alien to hold land. In case of a purchase by an alien, it was held that the title passed in

trust for, or limited by the power of, the government to escheat by office found or other act for that purpose. (Crosse v. Devalle, 1 Wallace, 13, and cases there cited; Sharswood's Blackstone, Vol. 1, 371; and 2 Kent Com., 53–54.) Until such action the title remained in the alien purchasing, so long as he lived; and if he became a citizen by naturalization, or by annexation or treaty, before such action by government, then the absolute title vested in him. Such was the case of Osterman v. Baldwin, 6 Wallace, 116, 122, the real purport and effect of which decision is mistaken in your former opinion. It does not conflict with the decision in Barrett v. Kelly, 31 Texas, 476, but accords with it, for the latter distinctly admits that proposition, but was decided on another ground, viz., that the grant to the alien defendant had not been declared void by government. That point in Osterman v. Baldwin is supported by Barrett v. Kelly, and various other Texas cases. (See Cryer v. Andrews, 11 Texas, 183; Babb v. Carroll, 21 Texas, 770; Lee v. King, 21 Texas, 582; Barclay v. Cameron, 25 Texas, 242; Christy v. Scott, 14 Howard, 294; and Wardrup v. Jones, 23 Texas, 494.)

In Portis v. Hill (30 Texas, 530), it was held that "alien heirs of citizens of Texas had the right to inherit in coparcenary with citizens, under the constitution and laws of Texas." The same doctrine was held also in Barclay v. Cameron, 25 Texas, 240, and was recognized in Cryer v. Andrews, 11 Texas, 170; and whenever the law gave rights to aliens it also gave them the remedies necessary to enforce them. (White v. Sabariego, 23 Texas, 246.)

These cases, however, hold also that the title thus descending from a citizen to alien heirs was a defeasible title, dependent on their performance of the conditions, and that upon non-performance the title vested in or was liable to escheat to the State. (See especially Barclay v. Cameron, 25 Texas, 241.)

That aliens generally could not maintain suits for land is determined in numerous cases. Hardy v. DeLeon, 5 Texas, 240, and White v. Sabariego, 23 Texas, 244, are direct to the point. So are Holliman v. Peebles, 1 Texas, 673; Yates v. Iams, 10 Texas, 174; and Barrett v. Kelly, 31 Texas, 482.

It is contrary to the policy of common law that an alien should plead or be impleaded touching lands in any court in the kingdom. (2 Bacon's Ab., Title, Uses and Trusts, E., 89.)

The same doctrine is held in courts of equity. (*Vide* 1 Daniel's Ch. Practice, 53; 2 Spence's Eq. Jur., 14; Orr v. Hodgson, 4 Wheaton, 453.)

As directly applicable to the case at bar, not merely on the general disability of aliens, but as showing the character of claim, and the mode of relief which Settegast, the ancestor, might have had for value of his improvements in his lifetime, and which only could vest in his alien children, we cite the following:

"An alien could not hold land in the Republic; therefore it would have been error to decree a conveyance to him in this suit; yet if the lands were taken in payment of debts due the alien, a court of equity would have ordered the land to be sold and the proceeds paid over to him." (Merle v. Andrews, 4 Texas, 216.)

Settegast, as an alien, could not transmit his claim of title to his children, alien or citizen.

That such was the common law we cited the following: "As aliens cannot inherit, so far they are on the level with bastards; but as they are also disabled to hold by purchase, they are under still greater disabilities; and as they can neither hold by purchase nor by inheritance, it is almost superfluous to say that they can have no heirs, since they can have nothing for an heir to inherit; but so it is expressly holden, because they have not in them any

inheritable blood." (2 Sharswood's Blackstone, 250; 2 Kent's Com., 53, 54; and to the same effect is 1 Washburn on Real Property, p. 63, 3d Ed., and notes.)

"The estate of which an intestate alien dies seized vests in the State without office found." (Barclay v. Cameron, 25 Texas, 240; Barrett v. Kelly, 31 Texas, 483; Thomas v. Gray, 1 Littell, 149; Slater v. Mason, 15 Pickering, 345; Fairfax v. Hunter, 7 Cranch, 603; Montgomery v. Dorion, 7 N. H., 475; Levy v. McCarty, 6 Peters, 102; Spratt v. Spratt, 4 Peters, 393; Moers v. White, 6 Johns. Ch., 360; People v. Conklin, 2 Hill, N. S., 69; Brown v. Sprague, 5 Denio, 545; Jackson v. Adams, 7 Wend., 368.)

We specially call attention to the following cases as applicable to the case at bar:

"An alien cannot at common law be heir to any one, nor can he transmit inheritable blood." (Smith v. Zaver, 4 Alabama, 99.)

"An alien cannot take by descent where the ancestor dies after preliminary declaration of intention to become a citizen, but before actual naturalization." (Foss v. Crisp, 20 Pickering, 121; McDaniel v. Richards, 1 McCord, 187; Eldon v. Doe, 6 Blackf., 341.)

Similar doctrine was held by the Supreme Court of the United States in Blight's Lessee v. Rochester, 7 Wheaton, 535. The decisive point in that case was thus announced by Chief Justice Marshall: "James Dunlap, therefore, if he continued to be an alien, continued liable to all the disabilities of alienage, one of which is an incapacity to transmit lands to heirs; consequently when he died the next of kin could take nothing by descent."

Now comes the query, had this rule been modified or repealed by any law of Texas? Appellees say it had, and the burden is on them to establish the change.

That assertion is based on the Martin Kostza case and

Judge Lindsay's construction of the fourteenth section of Act of Descents of 1840, and ninth of said Act as amended in 1848.

The origin and history of that clause of the statute fully elucidate its meaning, and that its purpose was plainly expressed according to the usual and plain meaning of its carefully considered and well chosen words, and that purpose was entirely different from what the learned justice supposed. It was not an original conception of the Texas Congress or Legislature. It was not framed by the Texas Legislature for any peculiar adaptation to Texas policy, or to make any peculiar modification of Texas law as to aliens. It originated in England in the time of William III., and is known there as an act of the eleventh and twelfth years of his reign, Chapter 6. It was then re-adopted in Virginia, Maryland, New York, and other colonies and States, and was copied in the Texas act *in totidem verbis*. The necessity for it in England, and its policy there, originated in the condition of British subjects of King William III. after the revolution of 1688 and abdication and exile of James II., and in consequence of the emigration or exile of other subjects during previous periods of political trouble. Many Dutch subjects of the new king had come over with him from Holland and had become British subjects, but their ancestors and relatives remained aliens in Holland or elsewhere. Many English descendants of British subjects who owned land in England thus, upon the death of those subjects, would, by English common law, have been excluded from the inheritance of their estates, because they would have to derive their descent through some ancestor, being aliens, in Holland or France. Such a result would be most unjust to the loyal English descendants who adhered to William, and in order to secure them in their right to inherit these estates by law, this act of Parliament was

passed, changing the common law. Its simple purpose and effect was to give the estate of an intestate British subject to loyal British descendants, who could only trace title by descent through some alien ancestor from the British intestate, instead of the title being cast instantly on the crown, as it would otherwise have been by the common law. The idea that its effect was to enable aliens to hold land in England, or to enable them to transmit the title by descent to anybody, alien or subject, was never dreamed of in that day. Such a proposition would not have been admitted by the English Parliament for an instant, even to please King William himself. It needs but slight reading of the history of those times to fully comprehend how outrageous such an act would have been considered by the English statesman.

The construction of Justice Lindsay is also opposed to the express decisions of the Supreme Court of the United States in the cases of McCreery v. Somerville, 9 Wheat., 354; and McKinney v. Sabariego, 18 How., 238.

Such a construction has never been advanced in any case in which that clause of the act has come under review. It has been considered in Johnson v. Sanders, 2 Leigh, 109; Jackson v. Green, 7 Wendell, 333; Jackson v. Fitzsimmons, 10 Wendell, 1; Levy v. McCarty, 6 Peters, 102; and by Judge Brockenbrough in Vint v. Heirs of King, 2 American Law Register, 719. In none of them was such a construction even mooted. Such a construction would necessarily have caused a contrary decision in Blight's Lessee v. Rochester, before cited.

That a court of equity would not aid Settègast himself, as an alien, to enforce specific performance, we think clearly shown by the cases already cited. But supposing it possible that such a conclusion may be attained—for all things seem possible—we now submit that the case made

on the record does not entitle appellees to specific performance at this day.

"The principle upon which courts of equity exercise their jurisdiction in decreeing specific performance of parol agreement, accompanied by part performance, is the fraud and injustice which would result from allowing one party to refuse to perform his part, after performance by the other upon faith of the contract." (Buckmaster v. Harrop, 7 Vesey, 346; Mandy v. Joliffe, 5 My. and Cr., 177.)

Now, can it be said to be fraud or injustice for a party to refuse to convey land to an alien, who is prohibited by law to hold it, and had paid no part of purchase money, when he can be compensated in damages for the former improvements claimed as part performance? We think not.

It was held in England, by Sir William Grant, that the fact that money spent in repairs, easily admitted of compensation without execution of the parol agreement, was a reason for not considering it part performance. (France v. Dawson, 14 Vesey, 386; and similar doctrine was held in O'Reilly v. Thompson, 2 Cox, 271.)

Where the acts relied on are proper to be brought before a jury, and can be answered in damages, they will not be considered as part performance. (South Wales Railway Co. v. Wythes, 1 K. and J., 186.)

It will also be seen that the only allegations of part performance are generally stated, viz: That their ancestor purchased, was in possession and resided on it two years, made valuable improvements, which are described, and the extent of value alleged at $1000. These allegations constitute the whole case of part performance found by the jury, who also found against the allegation of payment of any part of purchase money. Will the court then strain the statute, make law outside of it, and compel

a title in favor of an alien's heirs, upon their offer to pay the purchase money, after the lapse of fifteen years? This is the decision which was made in the court below, and which you are asked to affirm!

We respectfully submit that such a decision is not expected by us. If such be the law, then the estates of decedent citizens are exposed to loss and ruin by the speculative propensity of the heirs of aliens half a generation after the alleged transactions. And the more infamous the charges they may see fit to make against the dead man, benefactor of their ancestors, without proof to sustain them, the more likely they are to sustain their unjust claims against the heirs of dead citizens.

No brief for appellees has reached the hands of the Reporters.

WALKER, J.—The reconsideration of this case has not changed our former opinion upon the main question involved. We do not now propose to deliver an opinion to take the place of that formerly delivered, touching the rights of the appellees to inherit property from their father. W. M. Settegast, deceased, was a native of Prussia, who emigrated to the State of Texas and settled here in the year 1851. His sons, the appellees, were children of a tender age at the time their father came here. W. M. Settegast purchased the land in controversy from John W. Schrimpf, entered into possession, and made valuable and permanent improvements. After remaining in the country long enough, he made the usual declaration before the clerk of a court of record, of his *bona fide* intention to become a citizen of the United States, but died before he had been here long enough to receive his certificate of citizenship. The appellees, on coming of age, became citizens of the United States and of

the State of Texas. It is our opinion that on the death of their father they took an estate of inheritance in his land.

The second branch of this case demands our attention. The verdict of the jury gives the appellees the land on payment of the purchase money, and it is contended that the appellees are not entitled to the land, but must be content with payment for their improvements. We think, however, the doctrine is well settled in our State, that possession and improvements under a parol contract of sale entitles the vendee in equity to a specific performance, on tender or payment of the purchase money.

The judgment of the District Court is therfore affirmed.

AFFIRMED.